**In re GRAND JURY PROCEEDINGS.**

**In the Matter of Andrew C. PAVLICK.**

**Appeal of UNITED STATES of America,**

**No. 80–3742.**

United States Court of Appeals, Fifth Circuit *

Unit A

Dec. 11, 1981.

Rehearing En Banc Granted Feb. 25, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Michael Schatzow, Veta M. Carney, Asst. U. S. Attys., New Orleans, La., for appellant.

Andrew C. Pavlick, Miami, Fla., Louis B. Merhige, New Orleans, La., for appellee.

Before MARKEY **, Chief Judge, and GEE and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Asserting the attorney-client privilege, Andrew C. Pavlick, an attorney at law, refused to tell a federal grand jury the name of the person who paid his fee for representing three defendants in a drug conspiracy case. The district court denied the government's motion to compel disclosure. We affirm.

*Background Facts*

In June 1979, the United States Coast Guard boarded a vessel, found a cargo of 18 tons of marijuana, and arrested the three members of the crew. Shortly after their arrest, Pavlick appeared as counsel for the three men who were subsequently tried, convicted and sentenced for conspiring to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846. Thereafter the three were granted immunity, brought

** Chief Judge of the U.S. Court of Customs & Patent Appeals, sitting by designation.

before a federal grand jury, and questioned about the drug transaction, including questions about the identity of other co-conspirators.

Prior to the grand jury session, the three defendants waived the attorney-client privileges arising out of their relationship with Pavlick. One testified that neither he nor his two associates had met or directly sought Pavlick's services prior to his appearance as their counsel. This defendant further testified that when he became involved in the conspiracy, he was assured he would be taken care of in the event of an arrest. All three defendants said Pavlick had informed them that another person had furnished the money for their legal fees and bonds. Pavlick did not reveal to them the identity of their benefactor.[1]

When he appeared before the grand jury, Pavlick invoked the attorney-client privilege and refused to identify the person who provided the money for the legal fees and bail bond costs for the three defendants. He again refused to identify this person at the hearing to compel disclosure.[2]

The district court noted that normally the attorney-client privilege does not prevent disclosure of the identity of a client. However, the court accepted Pavlick's contention that the facts of the instant case brought it within the exception to the rule set forth in *In re Grand Jury Proceedings v. Jones*, 517 F.2d 666 (5th Cir. 1975).

On appeal the government contends that (1) Pavlick failed to establish the existence of the attorney-client relationship between himself and the anonymous benefactor, and, alternatively, (2) the disclosure of the client's identity falls outside the scope of the privilege in this instance.

*Attorney-Client Relationship*

Our analysis commences with the threshold inquiry: At what point, for purposes of the attorney-client privilege, does the attorney-client relationship begin? We addressed this question in *Jones* and listed the basic elements which are necessary to establish the privilege:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

517 F.2d at 670. *See also United States v. Kelly*, 569 F.2d 928, 938 (5th Cir.), *cert. denied*, 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978).

The government contends that the attorney-client relationship was not established, there being no proof offered of advice requested or legal services performed. The government views Pavlick's testimony as mere conclusions, and cautions that to consider these sufficient would invite spurious claims and indicate an indifference as to whether the purpose of the privilege is being served.

We decline to accept the government's argument. Pavlick testified that the unidentified person contacted him to

---

1. We note the inconsistency of the withholding of this information with the aspirational statement contained in Canon 2, EC 2–21 of the American Bar Association Model Code of Professional Responsibility: "A lawyer shall not accept compensation or any thing of value incident to his employment or services from one other than his client without the knowledge and consent of his client after full disclosure." *See also* ABA *Opinion* 320 (1968).

The record reveals that Pavlick received approximately $40,000 in legal fees, $25,000 to pay the bonding company and $125,000 to be held in trust as collateral for the bonds.

2. The court inquired: "You were retained by somebody who told you to represent these people?" Pavlick responded: "And him and someone who was also worried about his own culpability."

secure legal services for the three defendants *and* to discuss his own criminal liability. Whether Pavlick actually undertook performance of the requested services is not dispositive. Once the individual told Pavlick about his legal problem, which involved potential criminal exposure, the attorney-client relationship, for the purposes of establishing the privilege, came into being. We note that the information of record, which Pavlick provided the district judge, only marginally suffices to support the finding that the client was concerned about his own culpability. In the future, we would prefer that the trial judge inquire further into the facts upon which the claim of privilege is based. This would involve additional inquiry into the nature of the client's potential criminal liability, an inquiry which may be made in open court or in chambers, but on the record.

■ We are cognizant that the "purpose of the privilege—to suppress truth—runs counter to the dominant aims of the law." 517 F.2d at 672. We must, however, balance the countervailing value—the encouraging of people to seek legal advice freely, and to speak truthfully and candidly to the attorney without fear that the communication will be disclosed. It is imperative that the privilege attach soon after the prospective client has contacted an attorney, and certainly not later than the point at which the person reveals facts tending to establish a criminal exposure. The existence of the privilege cannot be limited to instances in which the attorney-client relationship comes to full fruition by the payment of legal fees and the performance of legal services. If that were required, a person would be compelled to retain the first attorney consulted in order to preserve the privilege. Such a requirement would ignore the reality that during early consultations the lawyer, the client or both may choose not to formalize or continue the relationship. The client may not be able to pay the fee; the attorney may discover some fact which either obliges or persuades him not to accept employment; there may be a personality conflict, or, either, for no articulable reason, may decide against formalizing the relationship. As one commentator noted:

At the inception of the contacts between the layman and the lawyer it is essential that the layman feel free of danger in stating the facts of the case to the lawyer whom he consults. Even though the lawyer rejects the case and the relation of attorney and client never arose, the usual duties as to privileged communications and conflicting interests should apply. The general principle of law should be, each duty incident to the attorney-client relationship begins as early as is helpful to the effective working of the relationship.

*See L. Patterson & E. Cheatham, The Profession of Law* at 246 (*citing Taylor v. Sheldon*, 172 Ohio St. 118, 173 N.E.2d 892 (1961)). *See generally*, American Bar Association Model Code of Professional Responsibility, Canon 4, EC 4–1, DR 4–101.

We conclude that the benefits of the attorney-client privilege are available to the prospective client at least from that point in the consultation at which vulnerability to criminal prosecution is indicated. Viewed against that standard, we find that the privilege between Pavlick and the unknown party came into being during their early consultations.

### The *Jones* Exception

■ That the attorney-client privilege exists and extends to Pavlick's unidentified client does not end our inquiry. Usually the privilege does not protect the name of the client, for the "identity of a client is a matter not normally within the [attorney-client] privilege." *Jones*, 517 F.2d at 670–71 (*citing Frank v. Tomlinson*, 351 F.2d 384 (5th Cir. 1965), *cert. denied*, 382 U.S. 1028, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966)). In *Jones*, we recognized an exception to this general rule based on the holding in *Baird v. Koerner*, 279 F.2d 623 (9th Cir. 1960): "Under certain circumstances, an attorney must conceal even the identity of a client, not merely his communications, from inquiry." 517 F.2d at 671. We further concluded that the identity of a client is privi-

leged "when so much of the substance of the communications is already in the government's possession that additional disclosures would yield substantially probative links in an existing chain of inculpatory events or transactions." 517 F.2d at 674. This exception results from the concern that in certain instances, the attorney's disclosure of the client's identity would, in itself, tend to incriminate the client. In the instant case, the government has acknowledged that the determination of the undisclosed individual's name may lead to that person's indictment. The district judge was justified in sustaining the attorney's claim of the privilege.

### The Crime/Fraud Release

■ If an attorney's advice is sought to advance the commission of a crime or a fraudulent act or scheme, the attorney-client privilege may not be successfully asserted. The government maintains, in the alternative, that because the benefactor's payment of Pavlick's fees constituted an overt act in the conspiracy, his identity should not be protected. This argument is based on the defendants' testimony about the assurances of aid in the event of arrest. In *In re Grand Jury Proceedings in Matter of Fine*, 641 F.2d 199, 203 (5th Cir. 1981), we held that the attorney-client privilege is vitiated if an attorney is retained "to further present or intended *illegal* activity, regardless of whether the attorney knows his client's true motivations," (*citing United States v. Hodge and Zweig*, 548 F.2d 1347 (9th Cir. 1977)). *See also United States v. Gordon-Nikkar*, 518 F.2d 972 (5th Cir. 1975) (attorney-client privilege does not extend to conversations concerning plans to commit perjury). Nothing in this record indicates that when Pavlick was first approached the purpose was "to further present . . . illegal activity," or "to further . . . intended illegal activity." When Pavlick was consulted the boatload of marijuana had been seized and the three defendants had been arrested. Although there may have been a prior agreement that legal fees would be paid if arrests occurred, there is nothing to show that Pavlick was involved in that agree-

ment. The record reflects that Pavlick was retained to represent the three defendants and the unidentified client for *past* criminal acts. We noted the effect of this distinction in *Fine*:

> The *Baird* exception to the general rule is designed to protect the identity of clients who seek legal advice as to *past* activities that may result in criminal prosecution. If a legitimate legal relationship is an evidentiary lead to *subsequent, unrelated* criminal activity, no substantial interest of society is served by protecting the name of the client and fee arrangement involved in the legitimate activity.

641 F.2d at 204 n.5. Nothing in the record evidences any on-going activity when Pavlick was hired, other than attempts to avoid detection for past offenses. There being no proof, nor even an assertion, that the undisclosed client's name is wanted in connection with any illegal activity occurring after Pavlick was hired, we must conclude that Pavlick was engaged to represent his clients for past, completed criminal acts. The attorney-client privilege covers that representation, and the shield is not forfeited by the operation of the crime/fraud release.

■ We today address the situation in which a person consults an attorney, asks the attorney to represent others with whom the person is criminally culpable, and pays the attorney's fees. In that situation, involving only past, consummated criminal acts, where the mere disclosure of the identity of the person may measurably increase the risk of criminal charges, the attorney may and should assert the attorney-client privilege. Absent waiver by the client, that assertion should be honored unless an essential element as outlined in *Jones* is found wanting, or a limitation or exception as noted in *Fine* is found to apply. Capsulating, the identity of a person who seeks the advice of a qualified attorney, on a matter which includes that person's potential criminal exposure, where the mere disclosure of the person's identity would tend to incriminate for past criminal acts, is protected by the attorney-client privilege. Unless the client waives the privilege, the assertion by the attorney should be sustained.

The district court is AFFIRMED.

GEE, Circuit Judge, dissenting:

With regret, I find myself unable to concur in the careful opinion of my Brother Politz, though in fairness I must acknowledge that the opinion presents an arguable position about as well as that position could be put. The issues that we face today require us to strike a balance between two considerations of fundamental value: the citizen's right to seek advice of counsel regarding his past misdeeds and the legitimate interest of the state in ferreting out criminals. For two reasons, one tiny and peculiar to this case and another of far more universal application, I am driven to the view that my colleagues have struck this balance wrong. I place the minor reason in the margin, where it belongs.[1]

For the reasons stated in note 1, I do not believe that Mr. Pavlick made a showing sufficient to establish the existence of an attorney-client relationship between himself and the defendants' unknown benefactor. Even assuming *arguendo*, however, that Pavlick could have established such a relationship, I conclude that the facts of this case are not such as to permit an assertion of that privilege. Both the majority and the court below rely heavily on *In re Grand Jury Proceedings (United States v. Jones)*, 517 F.2d 666 (5th Cir. 1975), which created a limited and narrow exception to the general rule that a client's identity is not protected by the privilege. In *Jones* an attorney was not required to reveal to a grand jury the identity of one who paid legal fees and furnished bonds for clients charged with narcotics offenses where that disclosure would have supplemented already existing and incriminating evidence likely to lead to the indictment of the payor.[2]

1. The majority opinion turns on an initial assumption of fact: that the unknown benefactor of these confessed drug smugglers was presented by the record as a client of Mr. Pavlick, one concerned about his possible criminal liability in consulting Mr. Pavlick. Coming from one who bore the burden of proof to demonstrate the existence of an attorney-client relationship, *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978), cert. denied, 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978), Mr. Pavlick's testimony on the point is meager and vague: as the majority opinion accurately notes (page 1059 Note 2), the court inquired:

"Q: You were retained by *somebody* who told you to represent these people?
A: (Mr. Pavlick) And *him* (X, necessarily the somebody mentioned) *and* someone [else] who was also worried about his own culpability." (All emphasis added.)

In my view, this fragment from Mr. Pavlick's testimony—the sole relevant one—does not carry his burden. He is asked whether he was retained by "somebody [X] who told you to represent these people?" Pavlick (a lawyer) responds, "*And* him (X) *and* somebody (Y) who was also worried about his own culpability."

If Mr. Pavlick does not know how to choose his words, he does not belong in his profession. We are entitled to assume that he meant precisely what he said. What he said is subject to at least three interpretations, only one of which is consistent with treating X as Mr. Pavlick's client. One is that Y was "also"—like the three actual defendants whom X retained Pavlick to represent—worried, as were they, about his own criminal liability. Another is that Y, in addition to wishing the three defendants to have legal representation, was "also" concerned about his own exposure. The final and, in my view, most unlikely one is that Y, like X, was concerned about personal liability. It is only this last reading that furnishes support for the conclusion that X was Pavlick's client.

It seems to me that such a vague and ambiguous assertion furnishes little or no support for the ruling of the trial court. Speaking of the burden to be carried by one asserting this privilege, a sister circuit has observed:

That burden is not, of course, discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed.

*In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965). Mr. Pavlick's assertion as to his relationship with X falls short of being even an unambiguous conclusory one.

2. Finally, the prosecutor had already presented to the district court that the government possessed "information" about certain individuals who had paid out money to attorneys in excess of reported income. . . . Disclosure by the relators of the unidentified "patrons'" names would be directly relevant to corroborating or supplementing already-existent incriminating information about certain persons suspected of income tax offenses, regardless of those persons' possible complicity in marijuana traffic. . . . In any event, the income tax aspects of the government's inquiry demonstrate a strong independent motive for why the unidentified clients could be expected to (1) seek legal advice, and (2) reasonably anticipate that their names would be kept confidential.

*Jones* does not, however, stand for the proposition that the identity of a client is *always* privileged where its disclosure could incriminate him.[3] Rather, his identity is protected "when so much of the substance of the communication is already in the government's possession that additional disclosures would yield substantially probative links in an existing chain of inculpatory events or transactions." *Id.* at 674. The government in the instant case consistently stated that it possessed no information concerning the payor of the fees and was unsure if the identity of the payor would *necessarily* lead to an indictment—no existing chain of inculpatory events or transactions was present.[4]

Since this important aspect of *Jones* is missing here, I would look instead to the Ninth Circuit case of *United States v. Hodge & Zweig*, 548 F.2d 1347 (9th Cir. 1977), which more closely resembles the matter in hand. There the Internal Revenue Service sought disclosure of payments made by a third person on behalf of an attorney's clients. The court held that once the government made a prima facie showing that the attorney was retained in order to promote intended or continuing criminal or fraudulent activity, the privilege could not be asserted. *See Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933); *United States v. Fried-*

man, 445 F.2d 1076, 1086 (9th Cir. 1971), cert. denied sub nom. *Jacobs v. U. S.*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). In *Hodge & Zweig*, as here, the government made such a prima facie showing by presenting evidence that an integral part of the conspiracy was the agreement by participants to furnish bail and legal expenses for conspirators who were apprehended by law enforcement officials. Thus, though the appellate court determined that the existence of the privilege was established, it refused to countenance its assertion:

Our inquiry is not at an end, however. Because the attorney-client privilege is not to be used as a cloak for illegal or fraudulent behavior, it is well established that the privilege does not apply where legal representation was secured in furtherance of intended, or present, continuing illegality. *United States v. Friedman*, 445 F.2d 1076, 1086 (9th Cir. 1971); *see Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, [469] 77 L.Ed. 993 (1933); *O'Rourke v. Darbishire*, [1920] A.C. 581, 604 (Eng.) (per Viscount Finlay); 8 J. Wigmore, *supra*, § 2298. The crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of such an improper purpose. *United States v. Friedman*, 445 F.2d at 1086; *see Clark v.*

---

*Jones*, 517 F.2d at 674.

3. "[O]ur decision should not be taken as any indication of how we would decide a similar question if the inculpatory value of sought-after testimony were less obvious or largely attenuated." *Id.* at 675.

4. MR. FONSECA (Attorney for the government): The persons who were represented in this court were involved in a dope case. The government is seeking information about who paid the fees. The government apparently was looking for who paid the fees in an apparent on-going tax investigation concerning certain people who they have identified and they had the tax returns. And, they simply were going to get the attorneys to say how much and—and, was this the person who paid you. His tax return doesn't reflect that he had the money to pay you; therefore, we have the evidence now that he is involved in a crime.

In this case, I have no information as to who paid Mr. Pavlick these fees. This man may not be involved in the conspiracy, the person who paid him, you know, he may not be involved in the conspiracy of the three convicted defendants. There is a strong possibility that he was involved; otherwise, they would not have placed himself in a position of seeking legal representation for these three individuals and for paying their fees. But, all we are obtaining is this person's name, *just obtaining his name would not give us, necessarily the evidence to indict that person as was the case* in the Jones case. The mere identification of the defendant, of itself, of the person paying the money, of itself, would give the government a tax case in the Jones case, because they already had the fees, and all they needed was the name. THE COURT: It might well give you a conspiracy case in this matter. MR. FONSECA: It *might lead* to it. (emphasis added).

*United States*, 289 U.S. at 15, 53 S.Ct. 465, [at 469].

. . . . The guilty pleas further demonstrate that as an integral part of the conspiracy the participants agreed to furnish bail and legal expenses for conspirators who might be apprehended by law enforcement officials. Presumably, such an agreement was designed to hinder any criminal drug prosecution arising out of the conspiracy; as such, the agreement constituted part of the consideration for engaging in the conspiratorial activity.

In light of the above, we conclude that a prima facie case exists that payments to appellants, if any, made during the years 1970, 1971, and 1972 by and on behalf of Sandino were made pursuant to the conspiratorial agreement and thus in furtherance of the continuing drug conspiracy. We therefore hold that disclosure of the information requested in the IRS summons is required.

*Hodge & Zweig*, 548 F.2d at 1354–55 (footnote omitted).

It seems to me that, both from the standpoint of policy and that of logic, this says it all and says it correctly. To permit promised legal services to be used as bargaining counters—counters by which persons are induced to enter into concerted illegal activity—by drawing the cloak of the attorney-client privilege over such arrangements seems to me a result so egregiously undesirable that it should not be arrived at unless inexorably compelled by law or logic. I do not see that it is.

The promise of free legal services made here was no more than a fringe benefit for prospective drug smugglers, one of the agreements upon which a conspiracy was founded. When made, it necessarily contemplated that it could be performed only after its beneficiaries were hors de combat. Even so, like a future interest, it had a present value when received, but one that would have been destroyed had it not been made good. Thus, carrying out the promise was necessary to redeem its value and to maintain the value of like outstanding or future promises. In these circumstances, it seems to me inescapable that the act of procuring bail and counsel was an act carried out in furtherance of the conspiracy itself. Even if it be assumed that the smuggling portion of the conspiracy was over when performance of this promise occurred, this is still true, just as it would be true had the benefactor been apprehended while delivering to them any other portion of the benefits derived from the conspiracy by defendants. As an act of material importance to the criminal enterprise, performing the promise was a part of that enterprise. And as such, it no more merits shielding than any other criminal act in which a lawyer participates, however innocently.

Lawyers are not permitted to use their skills in furthering crimes. The transaction by which Mr. Pavlick's were bartered away, in advance and at a time when the prospective crime was in contemplation, seems to me to stand on no materially different footing and no more to deserve a cloak of secrecy than would a transaction in which advice was sought about a contemplated crime for use in planning it. That this is unprotected, even by a valid claim of privilege, is too firmly established to require citation of authority.

Nor does the logic of protecting the precious right of representation compel such a result. The case in hand is distinguished by the pre-existing promise, given to induce criminal activity. One who makes no such criminal promise would have nothing to fear from the rule of *Hodge & Zweig* that I would follow: he who makes promises of legal representation to induce others to engage in criminal activities may not cloak the transaction by which he redeems those promises in the attorney-client privilege, at least as to his identity,[5] by establishing a professional relationship with the attorney consulted. *After* third persons have run afoul of the law, without another having

5. We need go no further than this today, since no more is presented by the facts of the case.

induced it by such a promise, he may contribute what he likes to their defense—and, should he for some reason choose to seek legal advice at the same time from the same lawyer on the same subject—his identity will, in appropriate *Jones* circumstances, be protected.

No more than such a rule is required to safeguard any legitimate claim of privilege; no less can be countenanced if a criminal trafficking in legal services is to be avoided. Since I think such a result should be avoided if possible, and since it can be avoided without significant inroad on any legitimate claim of privilege, I respectfully dissent.

## ON REHEARING AND REHEARING EN BANC

Before BROWN, CHARLES CLARK, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, TATE, SAM D. JOHNSON, WILLIAMS and GARWOOD, Circuit Judges.

BY THE COURT:

A member of this Administrative Unit of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in this Administrative Unit in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by this Administrative Unit of the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.